# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

ROBERT EARL CHRISTOPHEL,

        Plaintiff,

    v.                                     Case No. 08-CV-755

MARY BRANDL,

        Defendant.

_____

# ORDER

On September 4, 2008, plaintiff Robert Christophel filed suit against defendant Mary Brandl. Brandl was Christophel's probation officer. Christophel brought suit pursuant to 42 U.S.C. § 1983 alleging that Brandl's imposition of a "no contact" rule between Christophel and his wife, Jackie, was a violation of Christophel's civil rights. On July 7, 2009, defendant moved for summary judgment. Christophel filed an opposition brief August 5, 2009; however, he failed to submit facts and/or cogent arguments in support of his claim. Defendant thereafter filed a letter noting the inadequacy of plaintiff's filing, and stated that she would not be filing a reply brief. Plaintiff thereafter filed two separate motions to appoint counsel; however, the court previously denied plaintiff's request for appointment of counsel, and there is no reason to either revisit or alter that previous ruling. (Order of April 30, 2009 [Dkt. #25]). Further, because the facts and law clearly demonstrate that defendant did not violate plaintiff's civil rights, defendant's motion for summary judgment will be granted.

## BACKGROUND

As is required when moving for summary judgment against a pro se litigant, defendant provided Christophel with the text of Fed. R. Civ. P. 56(e) & (f) and Civil L.R. 56.1, 56.2 and 7.1. Additionally, defendant's motion for summary judgment informed Christophel that:

> Any factual assertion in the affidavits (and other admissible proof) submitted or referred to in support of the defendant's motion will be accepted by the judge as true unless you submit affidavits or other admissible documentary evidence contradicting such assertion. Failure to oppose the defendant's affidavits (or other admissible proof) with your own affidavits (or other admissible proof) may result in entry of judgment against you.

(Def. Mot. S.J. at 1-2). Defendant filed proposed findings of fact (supported by admissible evidence) in support of her motion for summary judgment. Christophel did not dispute those proposed findings of fact. Thus, as Christophel was informed would happen, the court hereby adopts defendant's proposed findings of fact, and will rely on those facts in determining the outcome of this case. *See Salvadori v. Franklin School Dist.*, 221 F. Supp. 2d 957, 960 (E.D. Wis. 2001) ("Because the plaintiff has not contested any of the factual findings proposed by the defendants as contemplated under Local Rule 56.2, the court is permitted to conclude that the facts, as identified by the defendants in their proposed findings of fact, are undisputed." (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994)).

On June 22, 2007, Christophel was convicted on two charges, Battery and False Imprisonment, in Milwaukee County Circuit Court Case Number 2007CF1803. (DPFOF ¶ 4). According to the criminal complaint, this offense involved Christophel choking his wife to unconsciousness, throwing her to the floor, throwing her into an empty bathtub, pushing her against a wall, and then pushing her into a corner, where she was not allowed to move or use the phone to call the police. (DPFOF ¶ 4). When the police arrived at the scene, Christophel did not allow his wife to open the door, and the officers had to force entry. (DPFOF ¶ 4).

On August 31, 2007, the Milwaukee County Circuit Court withheld Christophel's sentence and placed him on probation for two years. (DPFOF ¶ 5). The court ordered several conditions of probation, including: absolute sobriety; compliance with any treatment and counseling programs determined to be appropriate by his agent; and, successful completion of the Batterer's Intervention Program. (DPFOF ¶ 5). In addition, the Court ordered Christophel to have no contact with his wife, Jackie Christophel ("Jackie"), "which rises to the level of probable cause for arrest for 'domestic abuse or harassment.'" (DPFOF ¶ 5).

Agent Brandl was assigned as Christophel's probation agent on September 10, 2007, and she scheduled Christophel for intake on September 25, 2007. (DPFOF ¶ 6). Prior to that meeting, Agent Brandl heard from Christophel several times. (DPFOF ¶ 6).

Case 2:08-cv-00755-JPS   Filed 03/17/10   Page 3 of 22   Document 38

First, on September 16, 2007, Christophel left Agent Brandl a message, saying that his wife ("Jackie") had moved out of the house and that "I don't know what she's going to pull." (DPFOF ¶ 7). Christophel also said that Agent Brandl should expect a call from Jackie or a friend of hers. (DPFOF ¶ 7). When Agent Brandl spoke with Christophel that same day, she gave him information regarding domestic violence counseling providers and told him to schedule an appointment. (DPFOF ¶ 7).

Two days later, on September 18, 2007, Christophel called Agent Brandl again, saying that Jackie had been at his house that day, and she had become violent. (DPFOF ¶8). He reported that Jackie was drinking and throwing things at him, causing him injury. Christophel said he called the Cudahy police, but the responding officers did not arrest Jackie and "just told her to leave." (DPFOF ¶ 8). When Christophel said he wanted to press charges against Jackie, Agent Brandl encouraged him to contact a Captain at the Cudahy Police Department and/or the District Attorney's Office. (DPFOF ¶ 8).

On September 20, 2007, Dimitrius from Batterers' Anonymous left Agent Brandl a message and said that Christophel had come in, but they could not accept him in the group because Christophel claimed he had "multiple personality disorder" and did not know "who would show up for group." (DPFOF ¶ 9). Christophel called Agent Brandl to discuss the situation, and she told him that they would talk about it at his intake. (DPFOF ¶ 9).

-4-

Christophel reported for intake on September 25, 2007. (DPFOF ¶ 10). He had already received and signed a copy of his general rules of supervision at his orientation on September 12, 2007. (DPFOF ¶ 10). At that time, he and Agent Brandl had a detailed discussion about his supervision. (DPFOF ¶ 10). They reviewed his judgment of conviction and court-ordered rules of supervision. (DPFOF ¶ 10). Specifically, Agent Brandl told Christophel that, although the Court had imposed a "no violent contact" order, she would require that he have "no contact" with Jackie as a rule of his probation supervision. (DPFOF ¶ 10). Agent Brandl explained that she felt "no contact" was necessary, particularly given the recent problems between them. (DPFOF ¶ 10). When Christophel asked about attending marriage counseling, Agent Brandl told him she would allow contact at counseling sessions, but he and Jackie would have to meet at the clinic only and then go their separate ways. (DPFOF ¶ 10). Christophel reported that both he and Jackie are alcoholics, and that Jackie was still actively drinking. (DPFOF ¶ 10).

On September 26, 2007, Agent Brandl called Jackie to tell her that she was requiring "no contact" between her and Christophel due to their recent problems. (DPFOF ¶ 11). Jackie agreed and then told Agent Brandl that the only reason she had gone to court to request a "no violent contact order" was because Christophel kept "bugging" her to do it and sending people to tell her to do it. (DPFOF ¶ 11). Jackie said that Christophel "plays mind games with me all the time – tells me to come back and then calls the police." (DPFOF ¶ 11). Jackie said Christophel was

-5-

"like Hitler" when they lived together. (DPFOF ¶ 11). She also said that Christophel told her that couples counseling was court-ordered and mandatory. (DPFOF ¶ 11). Agent Brandl told Jackie that couples counseling was not mandatory. (DPFOF ¶ 11).

On September 26, 2007, Agent Brandl also spoke with Christophel's Alcohol and Other Drug Abuse ("AODA") counselor at Renew. (DPFOF ¶ 12). The counselor reported that Christophel told him that Agent Brandl had recommended couples counseling for Christophel and Jackie. (DPFOF ¶ 12). Agent Brandl explained that she did not recommend it and did not believe it would be successful as long as Jackie was still drinking, particularly given the recent problems between the two. (DPFOF ¶ 12). Agent Brandl reiterated that she would, however, allow them to attend counseling sessions as the one and only exception to the "no contact" rule. (DPFOF ¶ 12).

On October 1, 2007, Agent Brandl spoke with Christophel and informed him of her conversation with Jackie. (DPFOF ¶ 13). Agent Brandl told him that Jackie did not seem to have any desire to see him right now, and the "no contact" rule would stand. (DPFOF ¶ 13). The following day, Christophel called Agent Brandl to report that he had admitted himself to the Veterans Affairs ("VA") Hospital. (DPFOF ¶ 14). Over the next few days, they discussed his participation in a long term program at the facility, as well as the "no contact" rule regarding Jackie. (DPFOF ¶ 14). When Christophel asked for permission to call Jackie to let her know where

-6-

he was, Agent Brandl refused, but said that she would call Jackie on his behalf. (DPFOF ¶ 14). Agent Brandl and Christophel also talked about Jackie coming to couples counseling at the hospital. (DPFOF ¶ 14). Agent Brandl agreed to ask Jackie about it, but she reminded Christophel that Jackie did not seem interested the last time Agent Brandl talked to her. (DPFOF ¶ 14).

On October 9, 2007, Dr. Haight, Christophel's psychologist, called Agent Brandl to discuss the "no contact" rule between Christophel and Jackie. (DPFOF ¶ 15). Dr. Haight said that Christophel told him it was not a legal no contact, but rather a "strong suggestion." (DPFOF ¶ 15). Agent Brandl told Dr. Haight that the "no contact" rule was an official rule of Christophel's probation supervision. (DPFOF ¶ 15). Agent Brandl also informed Dr. Haight that Jackie had indicated to Agent Brandl that she did not want to have contact with Christophel, and that she did not want to participate in counseling with Christophel. (DPFOF ¶ 15). Agent Brandl did agree, however, to double check with Jackie to make sure that was the case. (DPFOF ¶ 15).

After her conversation with Dr. Haight, Agent Brandl called Jackie on October 9, 2007. (DPFOF ¶ 16). Agent Brandl told Jackie that Christophel was at the VA Hospital. (DPFOF ¶ 16). Jackie confirmed that she was not interested in having any contact with Christophel at that time, and that she did not want to participate in any counseling with him. (DPFOF ¶ 16). Agent Brandl told Jackie to call to discuss the situation further if she changed her mind in the future. (DPFOF ¶ 16). Agent Brandl

left a message for Dr. Haight, confirming her conversation with Jackie. (DPFOF ¶ 16). Christophel called Agent Brandl later that day after Dr. Haight shared Agent Brandl's message with him. (DPFOF ¶ 16). Agent Brandl reiterated that Jackie did not want to see him. Christophel indicated that he understood and agreed that it was "time to move on." (DPFOF ¶ 16).

On October 17, 2007, Agent Brandl met with Christophel, and they discussed his progress. (DPFOF ¶ 17). He was in a long-term mental health treatment program at the VA Domiciliary, where he was taking part in several groups. (DPFOF ¶ 17). Christophel reported that he was still in love with Jackie, but that he was coming to terms with her desire not to see him. (DPFOF ¶ 17). He and Jackie had a divorce hearing scheduled for the following Friday. (DPFOF ¶ 17).

On October 18, 2007, Agent Brandl received a message from Jackie, saying that she had changed her mind and would like the "no contact" rule to be amended to "no violent contact." (DPFOF ¶ 18). She said she would call Agent Brandl back because she did not have a return phone number. (DPFOF ¶ 18).

Agent Brandl met with Christophel at the VA Domiciliary on October 22, 2007. (DPFOF ¶ 19). At that meeting, Christophel told Agent Brandl that he had seen Jackie at their divorce hearing on Friday, and that she now wanted to see him. (DPFOF ¶ 19). Agent Brandl told Christophel that she would only allow contact for counseling sessions. (DPFOF ¶ 19). When he asked whether Jackie could visit him, Agent Brandl said no and repeated that they were only allowed to have contact

-8-

during scheduled counseling sessions. (DPFOF ¶ 19). Agent Brandl told Christophel that she would consider amending the "no contact" rule in the future, depending on how well counseling went and how well Jackie progressed in terms of her sobriety. (DPFOF ¶ 19). Agent Brandl voiced her concern to him that he was prioritizing Jackie over his own recovery and mental health, and she encouraged him to focus on himself. (DPFOF ¶ 19). Agent Brandl reviewed Christophel's supervision rules with him, and he received a signed copy of them when they were done. (DPFOF ¶ 19).

The next day, October 23, 2007, Christophel called Agent Brandl and said he was leaving the VA Hospital to deal with his father's health problems. (DPFOF ¶ 20). Agent Brandl told him that she believed he was manipulating the situation to see Jackie because she now wanted to see him. (DPFOF ¶ 20).

Christophel reported and met with Agent Brandl on October 30, 2007. (DPFOF ¶ 21). He was living back at his residence, but said that he might also have to move to Oxford, Wisconsin, to care for his father, "hopefully with Jackie." (DPFOF ¶ 21). Agent Brandl told him he could not move with Jackie, and that she was still concerned about his priorities. (DPFOF ¶ 21). Christophel then asked for a new agent because Agent Brandl was "too hard on him" and only "yell[ed] at him." (DPFOF ¶ 21).

On November 4, 2007, Agent Brandl learned that Christophel's car had been involved in a hit and run accident. (DPFOF ¶ 22). Initially, Christophel claimed that

-9-

the car had been stolen, and he knew nothing about the accident. (DPFOF ¶ 22). Eventually, however, he admitted to being the driver in the hit and run. (DPFOF ¶ 22). He claimed the accident occurred when he suffered a "sober blackout." (DPFOF ¶ 22). Christophel received citations for Hit and Run and Failure to Maintain Control of Vehicle. (DPFOF ¶ 22). Neither Christophel nor the other driver had insurance. (DPFOF ¶ 22).

On November 6, 2007, Agent Brandl amended Christophel's supervision rules and discontinued his driving privileges. (DPFOF ¶ 23). Agent Brandl told him that he would not be allowed to drive until he stabilized with his medications and mental health, got insurance, and received permission from his agent. (DPFOF ¶ 23).

On or about November 8, 2007, Agent Brandl learned that Christophel was back in the VA Hospital. (DPFOF ¶ 24). They talked about him returning to the Domiciliary program to address his mental health issues. (DPFOF ¶ 24). Instead, on November 10, 2007, Christophel left Agent Brandl a message that he was discharging from the VA Hospital, against medical advice, to take care of some "personal business." (DPFOF ¶ 24). He did say, however, that he planned to go back to the Domiciliary on Tuesday, November 13, 2007. (DPFOF ¶ 24). He failed to do so. (DPFOF ¶ 24).

On December 11, 2007, Agent Brandl spoke with Renew counselor, Bob Lee. Lee reported that he had seen Christophel and Jackie for couples counseling.

(DPFOF ¶ 25).  Lee said that they seemed sincere and were making progress. (DPFOF ¶ 25).

When Agent Brandl met with Christophel on December 13, 2007, he told her that Jackie had attended two counseling sessions and things were going "great." (DPFOF ¶ 26).  Christophel said that he could not wait to be back together with Jackie.  (DPFOF ¶ 26).  Agent Brandl cautioned him that when and if the "no contact" rule was lifted, he and Jackie most likely would not be allowed to live together right away.  (DPFOF ¶ 26).  Christophel said he understood that his increased contact with Jackie would be gradual.  (DPFOF ¶ 26).

On December 14, 2007, Christophel's domestic violence counselor called Agent Brandl and reported that Christophel's progress was slow, and he had not yet been integrated into the regular group.  (DPFOF ¶ 27).  The counselor described Christophel's relationship with Jackie as "lethal," and he said that he believed the "no contact" rule should continue.  (DPFOF ¶ 27).

On December 19, 2007, two days before Christophel's next court review, Agent Brandl talked to Jackie again.  (DPFOF ¶ 28).  Jackie said that Christophel was trying to get her to come to his court review by calling endlessly and having his friends and family contact her.  (DPFOF ¶ 28).  Jackie told Agent Brandl that she believed Christophel only wanted her to go to counseling for his benefit, rather than for reconciliation with her.  Jackie believed that he was simply trying to get "credit and good markings" for his court review.  (DPFOF ¶ 28).  Jackie said she would like

-11-

to reconcile with him, but she was afraid he was only doing and saying what he had to for his upcoming court hearing, and that things would then go back to how they were. (DPFOF ¶ 28). Jackie stated that Christophel's sister told her that Christophel wanted Jackie to come to court and say that everything was fine and that she wanted everything lifted. (DPFOF ¶ 28). Jackie then said "I won't lie. He wants me there to lie." (DPFOF ¶ 28). She said she only attended the recent counseling sessions to prove to herself that it is the "same big game," and that if she did not do what he wanted, then "it's back to the VA (for him)." (DPFOF ¶ 28). She did not want to go to the court review because "he can manipulate me real good – just with a dirty look." (DPFOF ¶ 28). Jackie also said that she did not want the "no contact" rule lifted. (DPFOF ¶ 28).

At his December 21, 2007, review hearing, the Court ordered Christophel to serve 10 days of condition time for violating his rules of supervision. (DPFOF ¶ 29). Agent Brandl's next meeting with Christophel was on January 4, 2008. (DPFOF ¶ 30). He informed Agent Brandl that he had an appointment with his couple's counselor on January 7, 2008. (DPFOF ¶ 30). He and his counselor planned to decide on how to proceed since Jackie would not be attending. (DPFOF ¶ 30). Agent Brandl explicitly reminded Christophel that she had reinstated a full, "no contact" rule, and that he could not have any contact with Jackie at counseling sessions or otherwise. (DPFOF ¶ 30). Christophel's counselor discontinued couples counseling for the duration of the "no contact" rule. (DPFOF ¶ 30).

-12-

Christophel denied having any contact with Jackie over the next few months, and he eventually got back into a residential treatment program at the VA Hospital. (DPFOF¶ 31). He moved into the Domiciliary on April 15, 2008. (DPFOF ¶ 31). Christophel reported and met with Agent Brandl on May 6, 2008. (DPFOF ¶ 32). He brought in a letter that he claimed Jackie had left for him at an Alcoholics Anonymous meeting. (DPFOF ¶ 32). In the letter, Jackie said that she wanted the "no contact" rule lifted, and that she had been trying to call Agent Brandl, but had not received any return calls. (DPFOF ¶ 32). Agent Brandl told Christophel that she had not talked to Jackie nor received any messages from her since last December, when she told Agent Brandl that she did not want to see him. (DPFOF ¶ 32).

The following day, May 7, 2008, Jackie left Agent Brandl a message, asking her to lift the "no contact" rule. (DPFOF ¶ 33). Agent Brandl did not get an answer when she returned Jackie's call, but she did leave a voice message. (DPFOF ¶ 33). Agent Brandl explained that this was the first message she had received from Jackie since they spoke in December. (DPFOF ¶ 33). Agent Brandl reminded Jackie that Jackie had asked that the "no contact" rule remain in place at that time. (DPFOF ¶ 33). Agent Brandl also told Jackie that she should call to talk, especially if she had reconsidered and now wanted to see Christophel. (DPFOF ¶ 33).

Agent Brandl met with Christophel at the VA Domiciliary on May 12, 2008. (DPFOF ¶ 34). Agent Brandl told Christophel that she was suspicious about Jackie's voice message because it was the first time Jackie had contacted her in

-13-

months, and the call came just a day after Christophel shared Jackie's letter with Agent Brandl. (DPFOF¶ 34). Christophel denied having any contact with Jackie. (DPFOF ¶ 34). Agent Brandl informed Christophel that she had not heard back from Jackie, and that she would not change the "no contact" rule without talking to Jackie. (DPFOF ¶ 34).

On June 10, 2008, Christophel reported and met with Agent Brandl. (DPFOF ¶ 35). When he asked about the "no contact" rule, Agent Brandl explained that Jackie had not been in contact with her since her May 6, 2008, message. (DPFOF ¶ 35). Consequently, the "no contact" rule remained in effect. (DPFOF ¶ 35).

Jackie called Agent Brandl the next day, June 11, 2008. (DPFOF ¶ 36). Jackie asked Agent Brandl to lift the "no contact" rule so that she and Christophel could try and work things out. (DPFOF ¶ 36). When Agent Brandl asked Jackie about her drinking, Jackie said she had been sober since February. (DPFOF ¶ 36). Jackie also said she was attending AA meetings 3-4 times per week. (DPFOF ¶ 36). Agent Brandl agreed to modify the "no contact" rule to permit phone contact and personal contact for visits or counseling within the VA Hospital only. (DPFOF ¶ 36). Jackie agreed and said "that's good for me, too, so I can feel things out." (DPFOF ¶ 36). On June 12, 2008, Agent Brandl explained these same conditions to Christophel over the phone. (DPFOF ¶ 36).

Christophel reported to Agent Brandl on June 26, 2008, and said that Jackie had been coming to visit him. (DPFOF ¶ 37). He said that they were talking by

phone everyday, and that things were "great" between them. (DPFOF ¶ 37). When he mentioned lifting the "no contact" rule altogether to allow them to "live together as man and wife" again, Agent Brandl cautioned him that he was pushing things too quickly yet again. (DPFOF ¶ 37).

On June 30, 2008, Christophel called Agent Brandl and said that the VA would be discharging him from the Domiciliary that day. (DPFOF ¶ 38). Jackie also called Agent Brandl and asked her to lift the "no contact" rule because things had been going well between them. (DPFOF ¶ 38). At that time, Agent Brandl agreed to lift the "no contact" rule, but Agent Brandl told Jackie that she and Christophel could not live together. (DPFOF ¶ 38). Jackie said she was happy with that arrangement. (DPFOF ¶ 38). When Christophel called Agent Brandl on July 1, 2007, Agent Brandl told him the same thing – she lifted the "no contact" rule, but he and Jackie could not live together. (DPFOF ¶ 38).

On July 10, 2008, Christophel reported and met with Agent Brandl. Jackie accompanied him. (DPFOF ¶ 39). Christophel was wheelchair bound due to his reported severe back pain. (DPFOF ¶ 39). He asked if Jackie could stay with him temporarily to care for him until he healed. (DPFOF ¶ 39). Very shortly thereafter, however, he began talking about making the living arrangement "permanent, on a 'trial basis.'" (DPFOF ¶ 39). Agent Brandl told Christophel that she felt that this was another attempt to manipulate the situation and get Jackie back in his house. (DPFOF ¶ 39). Agent Brandl told him that she would only allow Jackie to live with

him during his recovery.  (DPFOF ¶ 39).  On August 15, 2008, Agent Brandl learned that the Cudahy Police Department had arrested Christophel for causing a disturbance at his home.  (DPFOF ¶ 40).  According to the department's paperwork, Christophel was "very intoxicated" at the time, and was hitting his head on the back of the squad car following his arrest.  (DPFOF ¶ 40).

On August 19, 2008, Agent Brandl spoke with Jackie, and Jackie confirmed the information Agent Brandl had received from law enforcement.  (DPFOF ¶ 41). Jackie said that she and Christophel had been drinking, and they argued.  (DPFOF ¶ 41).  The police responded because the argument was loud.  (DPFOF ¶ 41).  The police officers sent Christophel next door to spend the night and helped Jackie lock up the house.  (DPFOF ¶ 41).  Some time later, Christophel returned and tried to get in.  (DPFOF ¶ 41).  Jackie said she then called the police again because Christophel gets violent when he drinks.  (DPFOF ¶ 41).

The Department of Corrections proceeded to revoke Christophel's probation. (DPFOF ¶ 42).  His final revocation hearing took place on January 13, 2009, and ALJ Charles Guaokas revoked Christophel's supervision on January 26, 2009. (DPFOF ¶ 42).  That decision was upheld on appeal.  (DPFOF ¶ 42).

On April 21, 2009, the Milwaukee County Circuit Court sentenced Christophel to 3.5 years in prison (1.5 years of initial confinement and 2 years of extended supervision), as well as a concurrent term of six months incarceration.  (DPFOF ¶ 43).  He is now serving those sentences.  (DPFOF ¶ 43).

## ANALYSIS

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

Plaintiff has brought suit under 42 U.S.C. § 1983, which creates a private right of action for deprivation of Constitutional rights. "A cause of action under § 1983, requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Village of Homewood*, 446 F.3d 682, 687, (7th Cir. 2006). Because defendant Brandl was at all relevant times acting within the scope of her duties as an agent of the Wisconsin Department of Corrections ("D.O.C."), the second prong ("under color

-17-

of law") is clearly met.  Thus, the only remaining question is whether the imposition of the "no contact" order deprived plaintiff of a right secured by the Constitution or federal law.

The Constitutional right to freedom of association protects several different types of inter-personal relationships from undue intrusion by the State.  *Roberts v. U.S. Jaycees*, 468, U.S. 609, 617-18 (1984).  The marital relationship is clearly one such relationship entitled to Constitutional protection.  *Id.* at 619.  However, those convicted of crimes, such as plaintiff, do lose a measure of their liberties.  *See Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).  It is perfectly acceptable for the conditions of supervision to restrict a probationer's activities "substantially beyond the ordinary restrictions imposed by law on an individual citizen."  *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972).  Special conditions that restrict Constitutional rights are, therefore, upheld so long as they:  (1) are directly related to deterring the defendant and protecting the public; and (2) are narrowly tailored.  *U.S. v. Crandon*, 173 F.3d 122, 128 (3rd Cir. 1999).  If the "no contact" order meets these two prongs, then it was permissible.  *See United States v. Bortels*, 962 F.2d 558 (6th Cir.1992) (upholding condition of supervised release that prohibited individual from associating with her fiancee because she had acted recklessly and endangered the community at large in a high-speed chase to protect her fiancee from arrest); *U.S. v. Rodriguez*, 2006 WL 1130932, 6 (3rd Cir. 2006) (upholding condition of supervised release that

-18-

prohibited individual from having direct or indirect contact with her husband, without prior approval, because she had committed her crimes at her husband's behest).

> According to Wis. Stat. § 973.10(1):
>
> Imposition of probation shall have the effect of placing the defendant in the custody of the [D.O.C.] and shall subject the defendant to the control of the [D.O.C.] under conditions set by the court and rules and regulations established by the [D.O.C.] for the supervision of probationers, parolees and persons on extended supervision.

Id. As an agent of the D.O.C., Brandl is charged with helping probationers successfully reassimilate into the community, helping probationers adjust to and cope with community living, reducing crime, and protecting the public. WIS. ADMIN. CODE D.O.C. § 328.04(1) (2010). In furtherance of those goals, Brandl is authorized to establish "rules of supervision that are supplemental to existing court-imposed . . . conditions." WIS. ADMIN. CODE D.O.C. § 328.04(2)(d).

The undisputed facts establish that Christophel has a history of violent interactions with his wife. Limiting the type and amount of contact between Christophel and his wife was directly related to protecting Christophel and his wife from each other, and protecting the public from their violent interactions. Christophel argues that his wife did not need protection from him, and that if she decided that she did need protection she could have sought a restraining order. (Pl. Br. Opp. Mot. S.J. at 2). However, this argument fails to appreciate the fact that the "no contact" order was implemented as much for Christophel's benefit as for his wife's. Agent Brandl reasonably believed that first and foremost Christophel needed to

Case 2:08-cv-00755-JPS    Filed 03/17/10    Page 19 of 22    Document 38

focus on dealing with his alcohol addiction and his violent tendencies. She also reasonably viewed interaction between Christophel and his wife as hindering Christophel's progress in those regards rather than aiding his progress.[1]

Not only was the "no contact" order directly related to rehabilitating Christophel, as well as protecting Christophel, Jackie, and the public, but the order was also narrowly tailored. Agent Brandl frequently allowed contact at the hospital and in counseling sessions. She only forbade all contact when it was clear from her discussions with Jackie that contact between the two was causing more harm than good (such as when Jackie felt like Christophel was merely trying to use her to get "credit and good markings" for his court review). When Jackie informed Agent Brandl that she, Jackie, had been attending AA meetings and that she was interested in trying to "work things out" with Christophel, Agent Brandl modified the order to allow phone contact and visits within the VA Hospital. Agent Brandl even allowed Jackie to stay with Christophel temporarily in order to care for him when he was wheelchair bound. It is clear that the "no contact" order was not a permanent ban on contact, and it is clear that Agent Brandl regularly modified the order in response to the factual situation at hand. Thus, at all times, the order was narrowly tailored so as not to be overbroad, but rather to be only as limiting as necessary to protect Christophel, Jackie, and the public, and to aid Christophel in his reassimilation into society.

---

[1] This view was justified not only by the objective facts, but also by the opinion of Christophel's domestic violence counselor, who described Christophel's relationship with Jackie as "lethal". (DPFOF ¶ 27).

## CONCLUSION

The court notes that plaintiff has not sought monetary damages, but has sought an order directing that the "no contact" order be returned to a "no violent contact" order. Because the "no contact" order at issue was directly related to deterring the defendant and protecting the public, and was narrowly tailored to that purpose, the court has no basis to grant plaintiff the relief he seeks. It could, of course, be argued that Brandl's "no contact" order was more than "supplemental" to the "no violent contact" condition of probation imposed by the trial court, thus that Brandl was without authority to impose such a condition. However, to the extent that plaintiff seeks altering of the "no contact" order on this theory of his case, such arguments should be made to the trial court that imposed the original "no violent contact" order. *See State v. Brownson*, 1997 WL 291958, 2 (Wis. App. 1997) ("It is for the sentencing court to arbitrate whether a department-imposed condition of probation is consistent or inconsistent with a court imposed condition.") (citing *State ex rel. Taylor v. Linse*, 469 N.W.2d 201, 203 (Wis. App. 1991)). The court further notes though that, since the imposition of the original "no violent contact" order, plaintiff's probation has been revoked, and he was thereafter sentenced on April 21, 2009. The court has no knowledge of the probationary conditions imposed by the sentencing court at this latest sentencing. Indeed, if the sentencing court altered its own "no violent contact" order to a "no contact" order, then the entire issue would now be moot.

-21-

Accordingly,

**IT IS ORDERED** that defendant's Motion for Summary Judgment (Docket #28) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that plaintiff's Motions to Appoint Counsel (Docket ##'s 35 & 36) be and the same are hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is herewith **DISMISSED** on its merits together with costs as taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge